# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO SOTO, | CASE NO. 1:06-cv-0606-AWI-DLB PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | (Doc. 21) |
| D. ADAMS, et al., | |
| Defendants. | |

I.   Findings and Recommendations Addressing Motion for Summary Judgment

   A.   Procedural History

   Plaintiff is a former state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on plaintiff's complaint, filed April 20, 2006, against defendants Polk, Cuevas, Mendez, Adams, and Clark ("defendants") for use of excessive force and failure to protect him from serious harm in violation of the Eighth Amendment. On June 25, 2007, defendants filed a motion for summary judgment, and on August 10, 2007 plaintiff filed an opposition.

   B.   Summary Judgment Standard

   Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.

1  Civ. P. 56(c). Under summary judgment practice, the moving party

2        [A]lways bears the initial responsibility of informing the district court
      of the basis for its motion, and identifying those portions of "the
3        pleadings, depositions, answers to interrogatories, and admissions on
      file, together with the affidavits, if any," which it believes
4        demonstrate the absence of a genuine issue of material fact.

5  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It is the moving party's burden to establish that

6  there exists no genuine issue of material fact and that the moving party is entitled to judgment as a

7  matter of law. British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978).

8      "When the moving party does not have the burden of proof on the issue, he need show only

9  that the opponent cannot sustain his burden at trial." Calderone v. United States, 799 F.2d 254, 259

10  (6th Cir. 1986) (quoting from W. Schwarzer, Summary Judgment Under the Federal Rules: Defining

11  Issues of Material Fact 99 F.R.D. 465, 487 (1984)). "But where the moving party has the burden -

12  the plaintiff on a claim for relief or the defendant on an affirmative defense - his showing must be

13  sufficient for the court to hold that no reasonable trier of fact could find other than for the moving

14  party." Id. Thus, as to defendants' motion for summary judgment, "where the nonmoving party will

15  bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly

16  be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions

17  on file.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Indeed, summary judgment should

18  be entered, after adequate time for discovery and upon motion, against a party who fails to make a

19  showing sufficient to establish the existence of an element essential to that party's case, and on

20  which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof

21  concerning an essential element of the nonmoving party's case necessarily renders all other facts

22  immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as

23  whatever is before the district court demonstrates that the standard for entry of summary judgment,

24  as set forth in Rule 56(c), is satisfied." Id. at 323.

25      If the moving party meets its initial responsibility, the burden then shifts to the opposing

26  party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

27  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence

28  of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

///

///

      C.     <u>Undisputed Material Facts</u>

1. Plaintiff was a state prisoner at the Substance Abuse Treatment Facility (SATF) and State Prison at Corcoran, California at all times relevant to his complaint.

2. Since the activation of the SATF in 1997, Facility A and B were designated to house Level II general population inmates. Because of continuing conflicts between the Northern Hispanics Inmates and other gang affiliated inmates, all of the Nrthern Hispanic inamtes were housed in Facility A. From 2000 to 2003, there were a series of violent incidents caused by the Northern Hispanic inmates' aggressive behavior towards other inmates on Facility A. Because of the continuing problems with Northern Hispanics inmates, prison officials decided that the Northern Hispanic inmates be removed from Facility A for the safety and security of the institution. However, as there was no other facility at SATF to house them, the decision was made to transfer all of the Northern Hispanic inmates to SATF. Correspondingly, a plan was developed to exchange Northern Hispanic inmates with a neighboring prison. In mid-2003, the California Department of Corrections and Rehabilitation (CDCR) decided to change Facility A to a special needs yard facility. Thus, any Level II general population Northern Hispanic inamtes who arrive at SATF were placed into administrative segregation for their safety and eventually transferred to another institution.[1]

3. In October 2005, SATF received a policy clarification concerning the placement of Northern Hispanic inmates. Up to that point, Northern Hispanic inmates could not be housed at SATF's Level II Facility (Facility B) for safety concerns because Facility B was

---

[1] Plaintiff's objections to paragraphs 3, 5, 6, 7, 9, 10, 15, 16 and 17, of T. Wan's Declaration are overruled. Mr. Wan's attestation that he was the Associate Warden at the time of the incident and that as the Associate Warden he was familiar with the plan and security measures implemented for the 2005 re-integration of Northern Hispanic inmates from Facility C to Facility B is based on personal knowledge and is therefore properly set forth in the declaration. Fed. R. Civ. P. 56(e); <u>Barthelemy v. Air Lines Pilots Assoc.</u>, 897 F.3d 999, 1018 (9th Cir. 1990) (personal knowledge may be inferred from declaration).

|     |     |     |
| --- | --- | --- |
| 1   |     | predominately Southern Hispanic. Because of CDCR's non-segregation policy and because |
| 2   |     | CDCR wanted more inmates to be allowed to program at SATF's Level II Facility, CDCR |
| 3   |     | directed SATF officials to implement reintegration of Northern Hispanic inmates, including |
| 4   |     | inmate Soto, into Facility B, which was predominately Southern Hispanic. |
| 5   | 4.  | To prepare for re-integration, Facility A and B officers, supervisors and counselors were |

4. To prepare for re-integration, Facility A and B officers, supervisors and counselors were assigned the task of gathering information from the affected inmates, including inmate Soto, by interviewing then and observing and evaluating the reaction of the inmate population regarding the arrival of the Northern Hispanic inmates into Facility B.

5. SATF's Investigative Services Unit monitored inmate mail, calls and interviewed information to identify possible leaders within the Southern Hispanic inmates in Facility B and the Northern Hispanic inmates in the Facility C gymnasium who would instigate, incite, or order the northern and Southern Hispanic inmates not to cooperate with the interrogation. Defendants contend all identified instigators and inciters were removed from Facility B and Facility C gymnasiums before re-integration.

6. Defendants contend that all Facility C correctional counselors reviewed the central files of all Northern Hispanic inmates, including inmate Soto, who were to be re-integrated into Facility B to ensure that each inmate met the Level II custody housing criteria and, most importantly, that the re-integration inmates had no enemy concerns with inmates already in Facility B.

7. Defendants contend that at all times up to the date of the incident on December 6, 2005, inmate Soto informed no correctional staff or officials of any safety concerns that he had with other inamtes or staff. Defendants contend there was no information that Soto had been threatened by any person or faced any substantial risk of harm.

8. Before the re-integration, Facility B staff made bed moves in Facility B Building B1 and B3 to make room for the arriving Northern Hispanic inmates. The numbers of Southern Hispanic inmates who were to remain in Facility B was to match the number of arriving Northern Hispanic inmates. In addition, bed moves were made within Facility B to disrupt territorial control by the inmates in the housing units.

9. Meetings were conducted between Facility B Southern and Northern Hispanic representatives allowing them to express and resolve differences before the re-integration. An additional meeting was held between Inmate Advisory Council representatives and the Northern Hispanic inmates allowing them to air concerns about the Facility B program.

10. On the day before the re-integration, Facility C staff conducted a thorough search of the Facility C gymnasium to ensure that no inmates possessed weapons or dangerous contraband that would be introduced to Facility B by the Northern Hispanic inmates. Similarly, in the days before the re-integration, a massive search was conducted of Facility B to seize any existing weapons or contraband. All weapons of convenience were closely controlled and monitored by the housing staff of Facility B.

11. During the week before reintegration, the Facility B vocational program was closed and repeatedly searched to prevent dangerous contraband or weapons from being introduced into Facility B.

12. On the day of the integration, all Northern Hispanic inmates underwent an unclothed body search as well as a search of their personal property. All transferred inmates went through a metal detector before being escorted into Facility B. Facility C staff escorted the inmates to their assigned housing units and remained at Facility B until the re-integration was completed.

13. The re-integration was concluded on December 6, 2005, on second watch and on a Tuesday, to specifically utilize the availability of extra correctional staff to enhance security and protection for the re-integration.

14. Plaintiff indicated there were a lot of correctional officers in the area.

15. On the day of the re-integration the Facility A Code 3 Response Team consisting of three officers was alerted and staged in readiness at the re-integration site and ordered to remain on-site until informed that their services were not needed.

16. Defendants contend that at all relevant times, correctional staff and officials implemented procedures both before and during the re-integration process and reasonably responded to the risk of harm to all re-integrated inmates, including plaintiff.

17.  Defendants contend that at all relevant times, correctional staff or officials had no awareness of any facts concerning inmate Soto which led to an inference, suspicion, conclusion or belief that a substantial risk of harm existed for him. Defendants contend the risk of harm faced by inmate Soto was no greater than that of any other similarly situated inmate connected with the re-integration.

18.  On December 6, 2005, defendant Mendez was the correctional officer assigned to the B-3 Control Booth at SATF. On that day, defendant Mendez was equipped with a forty milliammeter launcher loaded only with wood baton rounds.

19.  On December 6, 2005, at approximately 1:50 p.m., a group of Northern Hispanic inmates were being escorted into the B-3 section. The transfer of Northern Hispanic inmates into the B-3 section was part of the process of reintegrating them into Facility B. On that day, the Northern Hispanic group was dressed in the state issued denim pants and shirts. The Southern Hispanic inmates, who were inside B-3 section, were dressed in white boxer shorts and white t-shirts. Defendant Mendez' position in the control booth was approximately ten to fifteen yards from the bunk area.

20.  As a group of four Northern Hispanic inmates were entering the B-3 section, they were first attacked by one Southern Hispanic inmate, who was then joined by another co-attacker. Mendez observed the two inmates hitting the entering inmates with closed fists. The altercation with all six Northern and Southern Hispanic inmates involved exchanges of blows, grabbing and quick and erratic changes in the positions of the combatants in relation to each other and Mendez's position in the control booth. Mendez saw all inmates actively engaged in the fight.

21.  Defendant Mendez activated his personal alarm which alerted other staff of an incident and was a signal for available staff to assist on-site officers, respond to the incident and restore order. After activating his alarm, defendant Mendez repeatedly ordered the inmates to "get down." This is an order for inmates to assume a prone position on the ground. The significance of a "get down" order is that it is a command for the inamtes to immediately stop fighting and lie spread-eagle on the ground. From this position inmates cannot attack

1       each other or officers and it allows responding officers to take charge of the situation in
2       relative safety. An inmate who remains standing signifies that he is still participating in the
3       incident, not complying with the order and thus, a threat to injure other inmates and staff.[2]

22. Defendants contend the inmates did not respond to Mendez's "get down" orders and continued fighting one another. Mendez fired four forty millimeter wood baton rounds. Mendez contends he aimed all rounds to skip approximately three feet off the floor at the inmates' legs and that the firing of the rounds was intended to temporarily incapacitate the inmate or discourage them from fighting each other. Mendez contends he did not discharge the baton rounds with the intention of striking any specific inmate, but directed the rounds, because of erratic movement of the inmates', towards their legs. Mendez contends he did not aim the baton rounds at any portion of the inmates', including inmate Soto's, upper torso or head. Even after the discharge of the rounds, Mendez contends the inmates did not get into a prone position until responding officers arrived at the scene.

23. Plaintiff did not see the projectiles before, during or after the injury.

24. Plaintiff does not know the number of projectiles that were fired.

25. Shortly after the incident, plaintiff reported that the type of projectile that struck him in the eye was a "stinger" round.

26. In addition to Mendez and the other officers responding to the incident, another officer, who was equipped with a forty-millimeter launcher loaded only with direct impact "stinger" rounds, provided cover support. The officer discharged three "stinger" rounds. "Stinger" rounds deliver multiple sets of small rubber balls or pellets that are markedly different than the wood baton rounds deployed by Mendez.

27. Based on defendant Mendez' training and experience and in compliance with Department policy, he assessed the incident as one that did not necessarily involve a threat of death to the

---

[2]Plaintiff's objection to paragraph 5 and 12 of D. Mendez's declaration is overruled. His statements are based on personal knowledge as a correctional officer and are therefore properly set forth in plaintiff's declaration. Fed. R. Civ. P. 56(e); Barthelemy v. Air Lines Pilots Assoc., 897 F.3d 999, 1018 (9th Cir. 1990) (personal knowledge may be inferred from declaration).

combatants and the number of inmates involved in the melee was limited. Mendez was aware that there were additional groups of inmates in the yard outside the section building who were waiting to be re-integrated. Therefore, in addition to Mendez wanting to stop the fight to prevent injury to the combatants, he also wanted to subdue the inmates fighting inside to prevent unrest spreading to the inmates in the yard. In this situation, officers are authorized to use non-lethal force to subdue and control the fighting inmates. Mendez was the closest officer to the incident and no other officer had entered the area.

28. The baton rounds are designed to subdue groups of inmates engaged in close quarter combat. In situations that do not involve a threat to the lives of inmates and staff, the appropriate discharge of baton rounds is to skip them off the ground to strike legs, buttocks and feet of the inmates. The skipping of the rounds off the floor lessens their force and the rounds striking less vital areas of the legs, buttocks and feet diminishes the possibility of serious injury. Defendant Mendez contends he followed department policy and discharged the baton rounds to skip off the floor with the intention of striking the legs of the combatants to subdue the inmates.

29. At all relevant times, defendant Mendez was not ordered, commanded or otherwise told by any staff or supervisor to discharge baton rounds at inmate Soto.

D.   Discussion

   1.   Excessive Force Claim

In his complaint, plaintiff alleges that on December 5, 2005, defendants deliberately forced groups of Northern Hispanic prisoners into sections occupied by Southern Hispanic prisoners who had been forewarned of the "plan." Comp. p. 3. Plaintiff contends that when reluctant Northern Hispanic prisoners were forced into Southern Hispanic sections, they were immediately attacked by forewarned Southern Hispanic prisoners and the fighting inmates were fired upon with wooden blocks and beaten by correctional officers. *Id.* Plaintiff contends that defendant Mendez was working the gunner station and during one of the "staged events," plaintiff, a Northern Hispanic prisoner, was shot with rubber type blocks by defendant Mendez after he had been attacked by Southern Hispanic inmates. *Id.* Plaintiff contends he was struck on his body and in his right eye by

9

at least one block causing permanent damage to his eye.

Defendants contend that defendant Mendez was not the shooter of the "stinger" round that hit plaintiff. However, assuming defendant Mendez did fire the projectile that hit plaintiff, defendants contend that plaintiff's claim that he was struck by the projectile does not rise to the level of a constitutional claim of excessive force. Defendants point out that plaintiff was one of the six combatants in the fight, which involved close quarter combat with the inmates constantly moving and changing positions. DUF 20. At the start of the fight, defendant Mendez was the nearest to the scene. DUF 27. After Mendez activated his personal alarm, he ordered the inmates to "get down." DUF 21.[3] Defendants contend that none of the inmates, including plaintiff, complied with the "get down" orders and continued to fight. DUF 22. Mendez therefore fired four forty-millimeter wood baton rounds, with the intention of the striking the legs of the combatants to subdue the inmates. DUF 22. Defendants argue that Mendez's response was a good faith effort to restore order and the firing of the baton rounds was the action of one officer to subdue six inmates as quickly as possible. Defendants contend Mendez tempered his actions by firing his rounds to skip off the ground, which lessened the force of the impact and he aimed at non-vital areas of the inmates' bodies. Defendants argue the use of force by Mendez was a proper and tempered response to an active threat and not malicious or sadistic.

The court finds that defendants have met their initial burden of informing the court of the basis for their motion, and identifying those portions of the record which he believes demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As stated above, in attempting to establish the existence of this factual dispute, plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).

---

[3] While plaintiff disputes Mendez's qualification to testify about the signifcance of the "get down" order, plaintiff does not present evidence to dispute the fact that Mendez ordered the inmates to "get down."

In his opposition, plaintiff contends any force used by prison staff was the result of the inappropriate manner in which the re-integration process was initiated and was therefore excessive physical force. Plaintiff argues that the need for the application of the force was induced by the actions of defendants in forcing plaintiff into a hostile environment in which it was known that he would face harm. Plaintiff also argues that he was being attacked by several Northern Hispanic inmates when Mendez gave the "get down" order and thus he could not have responded to any other order until his attackers were subdued.

"What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ." Hudson v. McMillian, 503 U.S. 1, 8 (1992). "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." Id. (internal quotation marks and citations omitted). The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident. Id. at 9; see also Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries)). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Id. (internal quotation marks and citations omitted). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." Id.

Here, it is undisuted that plaintiff and the other inmates did not comply with defendant's order to "get down." While plaintiff argues generally that defendants inappropriately initiated the reintegration process, plaintiff provides no evidence as to defendant Mendez's involvement in the process. Plaintiff does not dispute that at the time the order was made, he was involved in a fight with other inmates and did not respond to the order. Insubordination is a matter taken very seriously within the confines of an institutional setting. Plaintiff's failure to comply with the direct orders of defendant created a need for the application of force to gain plaintiff's compliance, and the force at issue was employed for the very purpose of gaining plaintiff's compliance with the order. When an inmate refuses to comply with the order of a staff member, a threat may be reasonably perceived by staff. Finally, the firing of baton rounds to skip off the ground was use of force tailored to gain plaintiff's compliance with defendants' orders to get down on the ground.

Viewing the evidence in the light most favorable to plaintiff, the general allegations that the re-integration process was inappropriate and that he did not hear defendant's orders to get down because he was involved in a fight do not support a claim for relief under section 1983 for use of excessive physical force against defendant Mendez.

2.  Failure to Protect Plaintiff from Harm

In his complaint, plaintiff alleges that pursuant to a "preconceived plan," on December 6, 2005, defendants "deliberately, repeatedly and with full knowledge and/or reckless indifference to the consequences, forced groups of Northern Hispanic prisoners into sections occupied by Southern Hispanics prisoners who had been forewarned of the plan." Plaintiff contends that defendant Polk directed the events and that when "reluctant Northern Hispanic prisoners were forced into Southern Hispanic sections, they were immediately attacked by forwarded Southern Hispanic prisoners and the fighting inmates were then fired upon with wooden blocks and beaten by correctional guards."

Defendants argue that plaintiff has failed to establish their individual involvement in the alleged constitutional violations. Defendants further argue that assuming plaintiff can establish a causal connection between the actions of defendants and the alleged constitutional violations, defendants had no knowledge or awareness of a substantial risk to plaintiff and whatever risk that may have existed was dealt with both before and during the incident. DUF 4-6. Plaintiff did not inform

1  correction staff of any safety concerns (DUF 7) and correctional staff had no specific information that
2  plaintiff had been threatened or faced a substantial risk of harm greater than that of any other similarly
3  situated inmate connected with the re-integration.  DUF 7.

5        The court finds that defendants have met their initial burden of informing the court of the basis
6  for their motion, and identifying those portions of the record which he believes demonstrate the
7  absence of a genuine issue of material fact.  The burden therefore shifts to plaintiff to establish that
8  a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith
9  Radio Corp., 475 U.S. 574, 586 (1986).
10        To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison
11  conditions must involve "the wanton and unnecessary infliction of pain . . . ."  Rhodes v. Chapman,
12  452 U.S. 337, 347 (1981).  Although prison conditions may be restrictive and harsh, prison officials
13  must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety.  Id.;
14  Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237, 1246
15  (9th Cir. 1982).  "What is necessary to show sufficient harm for purposes of the Cruel and Unusual
16  Punishment Clause depends upon the claim at issue . . . ."  Hudson v. McMillian, 503 U.S. 1, 8
17  (1992).  "The objective component of an Eighth Amendment claim is . . . contextual and responsive
18  to contemporary standards of decency."  Id. at 8 (quotations and citations omitted).  "[E]xtreme
19  deprivations are required to make out a[n] [Eighth Amendment] conditions-of-confinement claim."
20  Id. at 9 (citation omitted).  With respect to this type of claim, "[b]ecause routine discomfort is part
21  of the penalty that criminal offenders pay for their offenses against society, only those deprivations
22  denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of
23  an Eighth Amendment violation."  Id. (quotations and citations omitted).   Where a prisoner alleges
24  injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if
25  they acted with "deliberate indifference to a substantial risk of serious harm."  Frost v. Agnos, 152
26  F.3d 1124, 1128 (9th Cir. 1998).  The deliberate indifference standard involves an objective and a
27  subjective prong.  First, the alleged deprivation must be, in objective terms, "sufficiently serious . .
28  . ."  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

13

Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S. at 837.  Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45.  Prison officials may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk. Id. at 844-45.  Mere negligence on the part of the prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton. Id. at 835; Frost, 152 F.3d at 1128.

Although plaintiff contends that defendants knew of a substantial risk of harm to him and disregarded that risk, plaintiff has submitted no evidence in support of this contention.  Plaintiff makes general allegations that "the historic rivalry between Northern and Southern Mexicans within the California Department of Corrections is well documented and admitted."  However, plaintiff provides no evidence regarding the individual defendants knowledge or conduct.  Speculative and/or conclusory assertions are insufficient to raise triable issues of fact.  At this stage in the proceedings, plaintiff must do more than set forth general assertions regarding the risk to his safety or the knowledge and intent of defendants.

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837).  "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

Viewing the evidence in the light most favorable to plaintiff and drawing all justifiable inferences in plaintiff's favor, Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Anderson, 477 U.S. at 255, the evidence of a risk to plaintiff is limited to defendants' general knowledge of a historic rivalry between Northern and Southern Mexicans within the California Department of Corrections and defendants' knowledge that plaintiff was a Northern Mexican inmate.

14

However, it is undisputed that in October 2005, SATF received a policy clarification concerning the placement of Northern Hispanic inmates in Facility B based on CDCR's non-segregation policy and CDCR directed SATF officials to implement reintegration. DUF 3. There is no evidence that any of the named defendants had responsibility or participation in the creation of this policy. The court finds that this is insufficient to support a claim that defendants knew of and disregarded a substantial risk of harm. There is no evidence beyond plaintiff's conclusory allegations, that defendants knew of any particular risk of harm to plaintiff, beyond that faced by any other inmate. Nor is there evidence that the defendants had any authority or control over the reintegration process. Indeed, the only evidence regarding the individual defendants specific conduct on December 6, 2005, is inmate Pappas' declaration which states that he witnessed defendant Polk direct his staff to "use force." Plaintiff asserts that he was injured as a result of the "reckless method in which the attempted re-integration effort was implemented." However, plaintiff does provide any evidence regarding the named defendants involvement in the process nor does he dispute the efforts taken prior to the re-integration process to prevent or at least limit potential problems with the inmates. DUF 8-12. In sum, plaintiff has not presented any evidence sufficient to raise a triable issue of material fact on his Eighth Amendment claim against defendants for acting with deliberate indifference to his safety, and defendants are therefore entitled to judgment as a matter of law.[4]

### F. Conclusion

Based on the foregoing, it is HEREBY RECOMMENDED that defendants' motion for summary judgment, filed June 25, 2007, be GRANTED, thereby concluding this action in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **twenty (20) days** after being served with these Findings and Recommendations, the parties may file written

///

///

///

---

[4] In light of the finding that defendants are entitled to summary judgment on plaintiff's claim against them on the merits, the court does not reach defendants' argument that they are entitled to qualified immunity.

15

objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

    IT IS SO ORDERED.

    **Dated:   February 25, 2008**　　　　　　　　　／s／ **Dennis L. Beck**
　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE